## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 10 2017, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David Becsey
Zeigler Cohen & Koch
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Larry Craig, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br><br> *Appellee-Plaintiff*. | April 10, 2017 <br><br> Court of Appeals Case No. 49A02-1606-CR-1232 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Ronnie Huerta, Commissioner <br><br> Trial Court Cause No. 49G24-1510-F6-36339 |

**Brown, Judge.**

[1] Larry Craig appeals his convictions for resisting law enforcement as a level 6 felony, resisting law enforcement by fleeing as a class A misdemeanor, reckless driving as a class C misdemeanor, and leaving the scene of an accident as a class B misdemeanor. Craig raises four issues which we consolidate and restate as:

> I. Whether the trial court abused its discretion in excluding certain evidence;
>
> II. Whether the evidence is sufficient to sustain his convictions for resisting law enforcement and leaving the scene of an accident; and
>
> III. Whether his convictions for resisting law enforcement violate double jeopardy.

We affirm in part, reverse in part, and remand.

### Facts and Procedural History

[2] On October 9, 2015, Indianapolis Metropolitan Police Sergeant Scott Wildauer, who was driving his fully marked police car and wearing his police uniform, observed a vehicle going southbound and following a vehicle too closely. Sergeant Wildauer pulled behind the vehicle, and it immediately moved into the left turn lane of 16th Street, and "approximately 30 feet before it turned it put on its turn signal and turned left to pull into the gas station." Transcript at 51. After seeing the two violations for failing to signal 200 feet before a turn and following too closely, Sergeant Wildauer activated his lights and siren to conduct a traffic stop and followed the vehicle into the gas station.

[3] Sergeant Wildauer observed that the windows were tinted dark and he could not see anything in the vehicle. Sergeant Wildauer exited his vehicle and gave

several loud commands stating: "Please roll down the windows." *Id.* at 54. Sergeant Wildauer knocked on the back side of the window, continued his loud commands, and still could not see in the car, and the vehicle "sped off." *Id.* Sergeant Wildauer ran back to his vehicle, activated its lights and siren, and pursued the vehicle. The vehicle did not stop at more than three stop signs and sped over fifty miles per hour in a residential area which had a thirty-mile-per-hour speed limit. Sergeant Wildauer gave the license plate of the vehicle to dispatch. The vehicle turned left to pull into an alley, hit a guide wire with the front passenger side fender, and sideswiped an IPL pole. The driver overcorrected and headed towards a neighbor's fence and the vehicle stopped "as it just touched the --- the privacy fence, just came to rest there." *Id.* at 58.

[4] Sergeant Wildauer then observed the vehicle's driver side window was down and Craig in the vehicle. Craig exited the driver's side window and looked directly at Sergeant Wildauer. Sergeant Wildauer yelled "Stop, police" a couple of times, and Craig ran. *Id.* at 136. Sergeant Wildauer approached the vehicle with his gun drawn, opened the doors, and verified that no one else was in the vehicle.

[5] A few minutes later, Indianapolis Metropolitan Police Officer Christopher Winter apprehended Craig. Sergeant Wildauer went to the scene where Craig was apprehended, gave Craig a *Miranda* warning, and asked him why he ran. Craig said that he was afraid and that he "was trying to get home . . . ." *Id.* at 64.

[6] On October 15, 2015, the State charged Craig with Count I, resisting law enforcement as a level 6 felony; Count II, resisting law enforcement as a class A misdemeanor; Count III, reckless driving as a class C misdemeanor; and Count IV, leaving the scene of an accident as a class B misdemeanor.[1]

[7] On February 17, 2016, Craig filed a Motion to Dismiss or in the Alternative for a Directed Verdict at the Conclusion of the State's Evidence. Craig argued that his right to be free from illegal seizures as protected by the Fourth Amendment was violated by the pre-textual traffic stop that led to his arrest.[2]

[8] On April 12, 2016, Craig filed a motion to exclude the State's witness Sergeant Wildauer. He argued that Sergeant Wildauer admitted in a deposition to having been prescribed the narcotic pain killer Norco since January 2016 and he exhibited confusion and memory loss when describing the events of October 9, 2015. He also argued that if Sergeant Wildauer was allowed to testify, he should be permitted to inquire into the use of narcotics by Sergeant Wildauer and the effect on his ability to remember and testify.

[9] That same day, the court held a hearing wherein Craig's counsel pointed out that Sergeant Wildauer indicated in a deposition that he began taking a narcotic in January 2016. After some discussion, Sergeant Wildauer testified on direct examination at the hearing and prior to voir dire that he sustained an injury on

---

[1] Both counts for resisting law enforcement reference Sergeant Wildauer.

[2] The State asserts that the trial court never ruled on Craig's motion.

January 18, 2016, that he had been in treatment for the injury since it occurred, that he was prescribed Norco, and that it relieves some of the pain. When asked if it had any effect on him mentally, Sergeant Wildauer answered:

> You know I feel --- when I take it --- when I'm on it I feel a little loopy a little bit. I don't feel --- I'm careful not to drive when I'm on it and my first doctor that I had when I was injured --- I've been on same medicine since the day of the injury, he actually instructed me not to drive while I was on it[.]

*Id.* at 19. When asked how often he was supposed to take Norco, he stated: "I'm supposed to take---at first it was a tablet every six hours as needed for pain and then now it's a half tablet at a time as needed for pain up to one tablet every twelve hours . . . ." *Id.* at 20. He stated that he had not taken Norco the day of the hearing and the last time he took it was the previous day at 2:00 p.m. He stated that the pain relief from Norco was several hours but "definitely not twelve," and that he was on no other medications that may affect his mental status. *Id.* He also testified that he had not taken Norco or any other medication that could have affected his mental status on October 15, 2015.

[10] On cross-examination, he testified that he was on a generic form of Norco or some type of hydrocodone with acetaminophen and that he did not experience any withdrawal symptoms. On redirect examination, the prosecutor asked whether the pain he was in was having an effect on his ability to recall events or to give testimony, and Sergeant Wildauer answered: "Absolutely not." *Id.* at 32. The court denied Craig's motion.

[11]     The court then conducted a jury trial at which Sergeant Wildauer testified that he had seen the vehicle he stopped over a dozen times and that he had previously been approached by another detective who advised that "they saw some suspicious activity pertaining to the car, no individual, only that car and it might be involved in some criminal behavior." *Id.* at 51. On cross-examination, Craig's counsel questioned Sergeant Wildauer about an ongoing investigation into the vehicle and asked him if he initiated the traffic stop because he wanted to find out who was driving the vehicle. Sergeant Wildauer answered: "No, I did the traffic stop after seeing violations. As I think I testified before if I don't see violations I don't make a traffic stop." *Id.* at 91. Sergeant Wildauer stated that he did not issue a citation or ticket to Craig for failing to signal, speeding, or tinted windows.

[12]     After the State rested, Craig asked for a directed verdict on all counts and the court denied the motion. With respect to Count IV, leaving the scene of an accident as a class B misdemeanor, the court stated:

> Number 4 is kind of questionable as charged it's damaging a light pole. Indianapolis Power and Light ran the utility pole. There's no evidence that there's any damage to the pole. The question is is the guide wire part of the pole 'cause that's the actual item that was damaged. Officer Wildauer testified without a doubt that it was a steel wire that was coming down and it was snapped. I don't recall him indicating that there was any damage to the pole itself. So I don't know if the guide wire, you know, is part of the pole or not. I guess there's still enough evidence to let the jurors decide and you guys can make your arguments and characterize that evidence how you'd like to and make that to them. The standard is there has to be enough evidence there and the bench

is not to invade the jury's ability to make these calls if there is evidence enough to go forward and I find that there is enough evidence. It's close on the Number 4 but that---that's still enough for them to decide if you make that argument 'cause I agree there's no evidence that the pole was damaged it's the guide wire and I don't know if it's one in the same, you know, so. That's the way it is I'll let it go forward. So your motion, Defense, is denied.

*Id.* at 142.

[13] Craig testified that he had previous encounters with Sergeant Wildauer and that Sergeant Wildauer told him: "The next time I stop you make sure you have something for me about what's going on over there, who's doing what." *Id.* at 154. He testified that, on October 9th, he pulled into the gas station, Sergeant Wildauer knocked on his window, he drove away, and he did not hear any sirens or Sergeant Wildauer tell him to stop. He testified that Sergeant Wildauer followed him and he stated: "I'm like this dude is really following me so as I make a wide turn left I hit the telephone pole. I like nipped it and stopped up on the fence that was it and then I get out my car and I look to see if I messed up the front fender so it wasn't messed up, I'm like okay I'm gonna get back in and go home." *Id.* at 162. When asked why he was running, Craig answered: "I'm trying to get away from Officer Wildauer because of what he said about if I didn't have no information and be his snitch and tell him about what's going on and give him an arrest; I'm not gonna do that." *Id.* He testified that he "nipped" the pole but did not "even think [he] dented it." *Id.* at 164. On cross-examination, Craig answered affirmatively when asked if he

testified that there was in fact an accident with a pole. The following exchange occurred between the prosecutor and Craig:

Q. You hit the pole?

A. I nipped the pole.

Q. Is a nip a hit?

A. I didn't leave a dent in the pole.

Q. Please describe for me in your own words what the difference between nipping a pole with a car and hitting a pole with a car are?

A. With a car I can use an example as a pencil. You know how to play----you play pencil break in school. When you hit it it's a dent but if you hit it hard enough it breaks. It was a dent.

Q. Was it as a result of you driving into it?

A. Yeah, because of the wide turn I was trying to make, yes, because of Officer Wildauer---trying to get away from him because of our last conversation before this day.

Q. Did I hear a yes?

A. Yes.

*Id.* at 167-168. Craig also testified that Sergeant Wildauer attempted to hit him with his car.

[14] The jury found Craig guilty as charged. The court sentenced him to concurrent sentences of 545 days for Count I, 365 days for Count II, sixty days for Count III, and 180 days for Count IV.

## *Discussion*

### I.

[15] The first issue is whether the trial court abused its discretion in excluding evidence that Sergeant Wildauer had been prescribed hydrocodone with acetaminophen. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). Even when a trial court errs in excluding evidence, we will not find reversible error where that error is harmless; that is, where the error did not affect the substantial rights of a party. *See* Ind. Trial Rule 61.

[16] Craig argues that the court committed reversible error by precluding the defense from asking Sergeant Wildauer about his long-term and contemporaneous use of narcotic pain medication. He asserts that the defense's position was that he should have been allowed to ask about his narcotic use because it was relevant to Sergeant Wildauer's ability to testify accurately and truthfully as to his memory of the events and whether his recollections had been impacted by the several month continuous narcotic use. The State argues that Craig waived this

issue because he did not seek to admit this evidence at trial. It also argues that the court properly excluded this evidence because the evidence was irrelevant and inadmissible.

[17] Even assuming that Craig had not waived this issue, we cannot say that the court abused its discretion. Craig cites *McKim v. State*, 476 N.E.2d 503, 506 (Ind. 1985), in which the Indiana Supreme Court held that the extent of a victim's use of drugs and alcohol "would be pertinent only to her ability to recall the events on the dates in question had she been using drugs or alcohol at that time, or if she were on drugs at trial or if her drug and alcohol abuse was so extensive that her mind was impaired." We cannot say that any of these circumstances apply here. The record reveals that Sergeant Wildauer sustained an injury on January 18, 2016, and was prescribed hydrocodone and acetaminophen, and that he began taking the prescription only after the date of Craig's offenses in October 2015. Sergeant Wildauer testified at the hearing that he had not taken the medication since the previous day at 2:00 p.m., that the pain relief lasted several hours but definitely not twelve hours, that he did not experience any withdrawal symptoms, and that his pain had no effect on his ability to recall events or give testimony. Transcript at 19. Under the circumstances, we cannot say that the trial court abused its discretion in denying Craig's motion.

II.

[18] The next issue is whether the evidence is sufficient to sustain Craig's convictions for resisting law enforcement and leaving the scene of an accident. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

A. *Resisting*

[19] Craig argues that there was no serious danger specific to the vehicular operation that was being addressed. He asserts that Sergeant Wildauer issued no traffic tickets to him for following too closely, failing to signal, tinted windows, or speeding. He contends that the pretextual stop facilitated by a traffic violation of questionable validity was not reasonable in light of the circumstances and violated his rights under Article 1, § 11 of the Indiana Constitution. He asserts that the evidence is insufficient to establish that he was guilty of the offense of resisting by fleeing because Sergeant Wildauer's order to stop did not rest on probable cause or reasonable suspicion.

[20] The State argues that Craig did not raise any Fourth Amendment or Article 1, § 11 objection to the validity of the stop at any point during the trial. It argues that the order to stop in this case was valid as it was supported by probable

cause of traffic infractions and Craig was not free to disregard that order, and that Craig's argument that the stop was pretextual is irrelevant.

[21] Even assuming that Craig had not waived this issue, we cannot say that reversal is warranted. The offense of resisting law enforcement as a level 6 felony is governed by Ind. Code § 35-44.1-3-1, which at the time of the offense provided that "[a] person who knowingly or intentionally . . . flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop . . . commits resisting law enforcement, a Class A misdemeanor," and that the offense is a level 6 felony if "the person uses a vehicle to commit the offense . . . ."[3] Count I alleged that Craig "did knowingly flee from [Sergeant Wildauer], a law enforcement officer with the Indianapolis Metro Police Dept[.], after said officer identified himself by visible or audible means and visibly or audibly ordered said defendant to stop and in committing said act the defendant used a vehicle." Appellant's Appendix II at 22.

[22] In *Gaddie v. State*, 10 N.E.3d 1249 (Ind. 2014), which is cited by Craig, the Indiana Supreme Court addressed a person's choice of whether to comply with an officer's request to stop. In that case, defendant Gaddie walked away from an officer through the curtilage of a residence, which turned out to be his own

---

[3] Subsequently amended by Pub. L. No. 198-2016, § 673 (eff. July 1, 2016).

residence, while the officer was ordering him to stop following a disturbance at the residence. 10 N.E.3d at 1252. Gaddie did not stop or change his behavior, and he was charged with resisting law enforcement by fleeing after being ordered to stop. *Id.* On transfer, the Court observed:

> To hold that a citizen may be criminally prosecuted for fleeing after being ordered to stop by a law enforcement officer lacking reasonable suspicion or probable cause to command such an involuntary detention would undermine longstanding search and seizure precedent that establishes the principle that an individual has a right to ignore police and go about his business.

*Id.* at 1254. It held:

> [T]he statutory element "after the officer has . . . ordered the person to stop" must be understood to require that such order to stop rest on probable cause or reasonable suspicion, that is, specific, articulable facts that would lead the officer to reasonably suspect that criminal activity is afoot.

*Id.* at 1255.

[23]     Sergeant Wildauer testified that he was driving his fully marked police car, observed Craig's vehicle following another vehicle too closely and failed to signal 200 feet before a turn, activated his lights and siren, gave several loud commands to roll down the windows, Craig "sped off," he pursued Craig with his lights and siren activated, and Craig did not stop at more than three stop signs and did not stop until he overcorrected and sideswiped an IPL pole. Transcript at 54. We conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have determined beyond a

reasonable doubt that Sergeant Wildauer had reasonable suspicion or probable cause to order Craig to stop and that Craig committed resisting law enforcement as a level 6 felony.

B. *Leaving the Scene of an Accident*

[24] Craig argues that the evidence was insufficient to sustain his conviction for leaving the scene of an accident only because there was no damage to the utility pole and he was not charged with damaging a guide wire. The State argues that it was not required to prove that the utility pole was damaged in order to sustain the charge and that, even if it were required to prove damage, the evidence would still be sufficient.

[25] The offense of leaving the scene of an accident as a class B misdemeanor is governed by Ind. Code § 9-26-1-1.1 which at the time of the offense provided:

> (a) The operator of a motor vehicle involved in an accident shall do the following:
>
> > (1) Immediately stop the operator's motor vehicle:
> >
> > > (A) at the scene of the accident; or
> > >
> > > (B) as close to the accident as possible in a manner that does not obstruct traffic more than is necessary.
>
> \* \* \* \* \*

(b) An operator of a motor vehicle who knowingly or intentionally fails to comply with subsection (a) commits leaving the scene of an accident, a Class B misdemeanor.

(Subsequently amended by Pub. L. No. 63-2016, § 1 (eff. July 1, 2016)).

[26] The charging information alleged that Craig, "being a driver of a vehicle that was involved in an accident, involving a collision with a utility pole being the property of Indianapolis Power and Light, did knowingly or intentionally fail to stop the vehicle at the scene of said accident, or as close as possible thereto . . . ." Appellant's Appendix at 23.

[27] Sergeant Wildauer testified that Craig "sideswiped the pole . . . ." Transcript at 58. He also testified that the guide wire that anchors the pole to keep it steady was hit and broken. Craig testified he did not "even think [he] dented it," but also testified that he "nipped" the pole and later answered affirmatively when asked if he testified that there was in fact an accident with a pole. *Id.* at 164. On cross-examination, he testified "I didn't leave a dent in the pole," but later testified: "It was a dent." *Id.* at 167-168. We conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have determined beyond a reasonable doubt that Craig committed leaving the scene of an accident as a class B misdemeanor.

### III.

[28] The next issue is whether Craig's convictions for resisting law enforcement violate double jeopardy. Craig argues that his fleeing was one single act of

fleeing and that remand to the trial court to vacate the misdemeanor conviction is in order. The State agrees that Craig's convictions violate the prohibition against double jeopardy and that the misdemeanor resisting conviction should be vacated. Based upon the State's concession and our review of the record, we conclude that Craig's convictions violate double jeopardy principles. A violation of double jeopardy principles requires that we vacate the conviction with the less severe penal consequences. *Moala v. State*, 969 N.E.2d 1061, 1065 (Ind. Ct. App. 2012). We vacate Craig's conviction and sentence for resisting law enforcement as a class A misdemeanor. *See Lewis v. State*, 43 N.E.3d 689, 691 (Ind. Ct. App. 2015) (observing that the defendant's actions of fleeing by vehicle and then on foot constitute one continuous act of resisting law enforcement, holding that convictions on both resisting counts could not stand, and remanding the case to the trial court to vacate the defendant's conviction for resisting law enforcement as a class A misdemeanor).

## Conclusion

[29] For the foregoing reasons, we affirm Craig's convictions for resisting law enforcement as a level 6 felony, reckless driving as a class C misdemeanor, and leaving the scene of an accident as a class B misdemeanor, vacate his conviction for resisting law enforcement as a class A misdemeanor, and remand to the trial court to amend its sentencing order.

[30] Affirmed in part, reversed in part, and remanded.

Vaidik, C.J., and Bradford, J., concur.